IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MICHAEL EDWIN MCLEMORE,  )
                          )
             Petitioner,  )         8:18CV567
                          )
     v.                   )
                          )
SCOTT R. FRAKES,          )         MEMORANDUM AND ORDER
                          )
             Respondent.  )

Petitioner has filed a motion to stay so he may return to state court to present additional evidence of his innocence. The motion has been briefed. I now deny the motion.

### *Background*

In 1999, Petitioner was convicted by a jury of the murder of a woman with whom he had a relationship and use of a deadly weapon to commit that felony. The Nebraska Supreme Court later affirmed his conviction and resulting life sentence. *State v. McLemore*, 623 N.W.2d 315, 322 (Neb. 2001).

On June 15, 2016, the Nebraska Supreme Court issued a Memorandum Opinion denying Petitioner post-conviction relief. *State v. McLemore*, No. S-15-218 (Neb. 2016)[1] (filing no. 4-2). On October 18, 2018, the Nebraska Supreme Court summarily denied a second post-conviction action filed by the Petitioner. The court observed that there is no Constitutional right to counsel in a Nebraska post-conviction matter and that the action was time-barred. (Filing no. 4-3 at CM/ECF p. 9.)

---

[1] The decision does not appear to have been published but an authenticated copy has been submitted by Respondent and is found at the filing number indicated in the text.

The prime witness against Petitioner during the trial was an inmate who was held in the same jail as Petitioner. His name was Willie Martin. The Nebraska Supreme Court recapped Martin's testimony as follow:

> Willie Martin, an inmate housed in the same area as McLemore at the Douglas County correctional facility from September 16 to October 10, 1997, testified about conversations Martin had had with McLemore regarding Torres' murder. Martin had been previously convicted of four felonies and had three previous convictions for giving false information.
>
> Martin testified that 2 to 3 days after McLemore's arrival at the facility, McLemore told him that he had been charged with criminal mischief for entering the home of a woman he had been dating and cutting up her furniture. McLemore told Martin that the woman was a real estate agent who had several children. Martin further testified that McLemore stated that one day when it was "pouring down rain," McLemore had placed several telephone calls to the woman's house but was unable to reach her. McLemore told Martin that he became angry when he could not reach the woman because he believed that she was with another man.
>
> Martin testified that McLemore stated that he then started walking to the woman's house in the rain and entered the house through an unlocked patio door. Martin testified that McLemore stated that he became angry while waiting for the woman and cut up her furniture with a knife he had brought with him, cutting his finger in the process. McLemore then stated that the woman came home and that a struggle ensued. McLemore told Martin that he forced the woman outside and into her car. Martin testified that McLemore stated that "the bitch kept talking shit so I had to do something to her" and that he and the woman then "drove somewhere" in her car. McLemore told Martin that he "wasn't going to let her walk out of his life" and that he pulled out a knife and cut the woman's throat. McLemore told Martin that he put the woman's body in the trunk of the car and that McLemore knew that his fingerprints were in the car. McLemore stated that he left the car parked in the rain and started walking home, throwing the knife away as he

walked. At the time Martin had these conversations with McLemore, the police had not released any information about how Torres had died.

Martin testified that a few days after McLemore told him these things, he saw news reports dealing with Torres' death. At that time, he realized that this was the woman McLemore had been telling him about and contacted the police to give them the information.

[McLemore, 623 N.W.2d at 323-324](McLemore, 623 N.W.2d at 323-324).

### *The Attachments to the Motion*

Petitioner's motion (filing no. 8) has two attachments. The first attachment is a copy of a notarized statement of Jessup Smith dated February 20, 2003. (Filing no. 8 at CM/ECF pp. 5-7.) The second document is a partially transcribed taped interview of Willie Martin on December 8, 2018. (Filing no. 8 at CM/ECF pp. 8-45.)

The Smith statement basically asserts that Smith and Martin fabricated what Martin said at trial. According to Smith, they were able to do so from reports in the news about the facts of the case and what the police told them.

The interview of Martin purports to be conducted by a private investigator for Petitioner. There is no affidavit attesting to the document's authenticity. Moreover, it is apparent from the text of the transcription that it does not contain the entire interview. Still further, slightly more than six minutes of the interview are, according to the transcript, inaudible.

In the taped interview, which is long, wandering, and sometimes incomprehensible or irrelevant, Martin partially recanted his testimony at trial. Martin said that Petitioner said he wanted to rob the victim, a woman who had ended a relationship with him making him angry , and when she came home unexpectedly and tried to call the police he wrapped a phone cord around her neck 3 or 4 times and she passed out. *Id.* at CM/ECF pp. 28-29. However, Martin said that Petitioner told him:

"'I never cut her throat, but I did strangle her, but she wasn't dead.'" *Id*. at CM/ECF p. 25.

Martin also stated that, according to the Petitioner, other men were involved who Petitioner mentioned but refused to identify because "'I'm not no snitch [. . .].'" *Id.* at CM/ECF pp. 25-26. After Petitioner and the others put the unconscious victim in the trunk of a car, they went to do drugs at Petitioner's apartment. *Id.* When Petitioner and the other men exited the apartment they heard the victim knocking from the car trunk and sometime thereafter that is when at least one of the other men cut her throat. *Id*.

Martin said that Petitioner admitted stabbing the woman's couch–thus admitting that he possessed a knife and was angry and violent. (*Id.* at CM/ECF 36.) Martin told the private investigator that Petitioner said that "'they cut her throat *for me*.'" *Id.* (Emphasis added.) Martin then reiterated: "From the whole story he told me, *and I could tell that whole story again, his dope friends cut her throat for him,* or they cut her throat because . . . I don't know." *Id.* (Ellipsis in original) (Emphasis added.)

Martin told the private investigator that the police did not feed him facts or give him anything for his cooperation. *Id*. at CM/ECF pp. 35. Martin also told the private investigator that he did not rehearse his story with Smith in order to get them straight when the men talked to the police. *Id.* at CM/ECF p. 37. Martin speculated that Smith may have heard the same things that Martin heard from the Petitioner while the men where in the day room of the jail. *Id.* Martin specifically denied that he was acting as an agent for the state. *Id*. at CM/ECF p. 38.

The private investigator did not confront Martin with his actual trial testimony. He did not ask Martin to explain his actual trial testimony, particularly that part of the testimony where Martin swore that Petitioner admitted he had cut the victim's throat. Moreover, the private investigator was leading and suggestive. Still further, the private

investigator assured Martin that he could not be prosecuted. For example, near the beginning of the interview the private investigator states:

> Turns out the case is falling apart. [. . .] Jessup has retracted his confession from what he heard and all these kinds of things. The state's case is falling apart. The DNA evidence, the blood evidence, all this. *It doesn't look like this guy did it. It looks like they set you up with bad information to testify on. It's way beyond the statute of limitations. Nobody can harm you, nothing*, but this guy has been in for twenty years. He's looking at life, the rest of his life, and everything points to the fact that this guy didn't do it. The police experts, the DNA guys, the crime scene guys . . . everything's coming apart.

(Filing no. 8 at CM/ECF p. 10.) (Emphasis added).

### *Analysis*

I know of no authority under *Rhines v. Weber*, 544 U.S. 269 (2005) cited by Petitioner[2] or otherwise to stay a federal habeas case, particularly one involving a murder conviction that was obtained nearly 20 years ago, where the stay would be a waste of time. Wasting time is obviously contrary to all of the goals of the *Antiterrorism and Effective Death Penalty Act of 1996* (AEDPA). *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (Congress wished to curb delays, to prevent "retrials" on federal habeas, and to give effect to state convictions to the extent possible under law; Congress also intended to further the principles of comity, finality and federalism).

---

[2] The Respondent has not yet answered. So far as I can tell, the Petitioner does not claim that his habeas petition is a "mixed" petition. The failure to do so categorically rules out relief under *Rhines* since *Rhines* only involves cases with mixed petitions. *Charles v. Payne*, No. 4:17 CV 2494 CDP, 2018 WL 3208551, at *2 (E.D. Mo. June 29, 2018) (citing *Roberts v. Norris*, 526 F.Supp.2d 926, 946 (E.D. Ark. 2007)). A "mixed petition" is one where at least one claim is exhausted but another is unexhausted.

There are numerous reasons why staying this case so the Petitioner might return for the third time to a state post-conviction court would be a waste of time. Those reasons include the following:

***Reason 1.*** The Smith affidavit, dated February 20, 2003, is old news. It was used as a basis for one of the Petitioner's state post-conviction motions. (Filing no. 4-13 at CM/ECF pp. 122-123[3]; filing no. 4-9 at CM/ECF p. 41.) It is highly unlikely that the Nebraska state courts would find that affidavit standing alone sufficient to support consideration of yet another post-conviction action (or motion for new trial) since it had already been presented at least once before in an unsuccessful post-conviction action.

***Reason 2.*** The 2018 partially transcribed but unsigned interview of Martin cannot be relied upon. Portions were inaudible (over six minutes) and the transcript is otherwise incomplete.[4] As noted, the private investigator failed to confront Martin with his trial testimony or ask Martin to explain it and the investigator was leading and suggestive. He even assured Martin that he could not be prosecuted. Additionally, the partially transcribed interview is not authenticated as required by our rules. NECivR 7.1(a)(2)(C) ("An affidavit must identify and authenticate any documents offered as evidence. The affidavit must be made on personal knowledge, set forth facts admissible in evidence, show affirmatively that the affiant is competent to testify to the matters stated, and identify the related motion.") Accordingly, I give the partially transcribed interview no weight since it is untrustworthy.

***Reason 3.*** Even if one were to consider the 2018 partially transcribed interview, it would not establish Petitioner's innocence of the murder. As the

---

[3] Respondent uploaded page 122 upside down. It is necessary to use the rotate feature on the PDF reader in order to view the proper orientation.

[4] "Idle conversation from 1:09:33 until end." (Filing no. 8 at CM/ECF p. 45.) However, no ending time is provided.

Nebraska Supreme has made clear, "even if a defendant has not actually killed a victim, substantial participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the constitutional culpability requirement for a conviction of first degree murder . . . ." *State v. Lotter*, 771 N.W.2d 551, 564 (Neb. 2009) (footnote omitted).

An impartial reading shows that Martin described the following admissions made by Petitioner to him: (a) that Petitioner, estranged from the woman and angry, went to her house to rob her and that he also stabbed the woman's couch with a knife thus displaying a violent propensity to use a knife; (b) that Petitioner attempted to strangle the woman, when she came home unexpectedly, by wrapping a phone cord around the woman's neck three or four times when she tried to call the police–she passed out as a result; (c) that Petitioner and some male friends then put her in the trunk of a car; (d) that the group went to Petitioner's apartment; (e) that the group did drugs together; (f) that after doing drugs, the group exited the apartment; (g) that the group heard the victim knocking from inside the car trunk evidently to their surprise; and (h) that one or more of Petitioner's accomplices "cut her throat for me [Petitioner]."

***Reason 4.*** It is quite unlikely that the Nebraska courts would give credence to Martin's unauthenticated and unsworn recantation. As stated by the Nebraska Supreme Court, "It has been said that there is no form of proof so unreliable as recanting testimony.'The opportunity and temptation for fraud are so obvious that courts look with suspicion upon such an asserted repudiation of the testimony of a witness for the prosecution, and this is so even though the repudiation be sworn to.'" *Id.* at 563 (defendant was not entitled to successive post-conviction relief based upon codefendant's affidavit, stating that he committed perjury at defendant's trial and that he, not defendant, actually killed the victims) (citations and footnotes omitted). In this case, we do not even have a sworn affidavit.

***Reason 5.*** If the Petitioner tried to bring yet a third post-conviction action in the Nebraska courts, it is highly likely that he would be procedurally barred from doing so. As early as 2003, the Petitioner knew from Smith's sworn statement (affidavit) that Martin had allegedly lied. And, as noted earlier, Smith's sworn statement was presented in a prior post-conviction action.

The Nebraska Supreme Court has long held that the courts of Nebraska "will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." [*State v. Moore*, 718 N.W.2d 537, 542 (Neb. 2006)](citation omitted). Since Petitioner knew of the claim of Martin's alleged perjured testimony in 2003, and in fact presented the Smith affidavit in a prior post-conviction action, I am not persuaded that Nebraska would consider another post-conviction action based upon the assertion that Martin partially recanted his 1999 trial testimony in 2018 and thus allegedly implicated himself in the perjury that Smith had alleged. In other words, Petitioner would be procedurally barred under Nebraska law because he knew of the alleged perjury in 2003 and did nothing for nearly 15 years to pursue the matter further.

***Reason 6.*** Nebraska has a statute of limitations of one year for post-conviction motions. [Neb. Rev. Stat. Ann. § 29-3001(4) (West)](). Given the passage of time in this case between the 1999 conviction and 2018 unsworn and unauthenticated interview of Martin and the fact that Petitioner knew of the alleged perjury by virtue of the 2003 Smith statement, I think it highly unlikely that a Nebraska court would conclude that Petitioner "exercise[d] . . . due diligence" in procuring the Martin transcribed interview. Thus, Petitioner could not avoid the one-year statute of limitations. Indeed, when summarily affirming the denial of Petitioner's second post-conviction action the Nebraska Supreme Court concluded the action was time-barred.

***Reason 7.*** Assuming, without deciding, that the unauthenticated and unsworn transcription of Martin's 2018 interview is "new evidence" within the meaning of

Neb. Rev. Stat. Ann. § 29-2103(4) (West) and that Petitioner exercised due diligence,[5] I conclude that it is highly unlikely that a Nebraska court would, pursuant to that statute, grant a new trial based upon such evidence. Even if the Martin interview were considered "new evidence" and Petitioner was considered to have been diligent, Petitioner would still have to show that the interview was "evidence *so substantial that a different result may have occurred*." "Reasons 2, 3 and 4" set forth above convince me that the interview would be declared wholly insubstantial by a Nebraska court considering a motion for new trial.

IT IS ORDERED that:

1. The Motion to Stay (filing no. 8) is denied.

2. The Motion to Extend (filing no. 9) submitted by Respondent is granted in part and denied in part–a new progression order will be entered.

DATED this 4th day of June, 2019.

BY THE COURT

s/ *Richard G. Kopf*
Senior United States District Judge

---

[5] "(4) A motion for new trial based on the grounds set forth in subdivision (5) of section 29-2101 shall be filed within a reasonable time after the discovery of the new evidence and cannot be filed more than five years after the date of the verdict, unless the motion and supporting documents show the new evidence could not with reasonable diligence have been discovered and produced at trial and such evidence is so substantial that a different result may have occurred." Neb. Rev. Stat. Ann. § 29-2103(4) (West).