IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MICHAEL EDWIN MCLEMORE, | |
| Petitioner, | **8:18CV567** |
| vs. | |
| SCOTT R. FRAKES, | **MEMORANDUM AND ORDER** |
| Respondent. | |

This matter is before the court on Petitioner Michael Edwin McLemore's ("Petitioner" or "McLemore") Petition for Writ of Habeas Corpus. (Filing No. 1 & Filing No. 18.) For the reasons that follow, Petitioner's habeas petition is denied and dismissed with prejudice.

## I. CLAIMS

Summarized and condensed,[1] and as set forth in the court's prior progression orders (filing no. 3 & filing no. 22), Petitioner asserted the following claims that were potentially cognizable in this court:

Claim One:       Ineffective assistance of trial counsel as more specifically set forth in the petition.

Claim Two:       Prosecutorial misconduct denying Petitioner due process of law as more specifically set forth in the petition.

Claim Three:     Confrontation Clause violation as more specifically set forth in the petition.

---

[1] Petitioner did not object to the court's summary and condensation.

1

Claim Four:  Ineffective assistance of appellate counsel and ineffective assistance of postconviction counsel as more specifically set forth in the petition.[2]

Claim Five:  Petitioner was denied his Sixth Amendment right to counsel, namely a "*Massiah* violation" by use of an informant in violation of Neb. Rev. Stat. § 29-2262.01 (reissued 1995).

## II. BACKGROUND

### A. Convictions and Sentences

The court states the facts as they were recited by the Nebraska Supreme Court in *State v. McLemore*, 623 N.W.2d 315 (Neb. 2001) (filing no. 4-1). *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

Marcella Lynn Estes Torres (Torres) was a real estate agent who lived in Omaha with two of her children and her brother, Edward Mentzer. Torres was married, but the marriage was troubled. Torres' husband was incarcerated at the time of Torres' murder.

On July 25, 1997, Torres met McLemore, and the two began a dating relationship. Soon after the two met, McLemore developed strong feelings for Torres. However, by the end of August 1997, Torres had expressed a desire to end her relationship with McLemore.

---

[2] The court noted that ineffective assistance of postconviction counsel does not state a federal constitutional violation but may serve to excuse a procedural default in certain extraordinary circumstances. *See, e.g.*, *Barnett v. Roper*, 904 F.3d 623, 629 (8th Cir. 2018). (Filing No. 3 at CM/ECF p. 2 n.1.)

On the afternoon of September 1, 1997, McLemore accompanied Torres to a real estate appointment. After the appointment had concluded, Torres dropped McLemore off at his apartment and told him she would return to his apartment around 7 p.m.

Corine Alvarado, one of Torres' older daughters, was babysitting Torres' two younger children at Torres' residence that afternoon and evening. Between 5 and 6 p.m., Torres returned to her home to get ready to go out for the evening. She told Alvarado that she was going to the Anchor Inn. When she left the house that evening, Torres was wearing blue jeans, a black belt, a white tank top, and white pumps.

Thereafter, Torres went to the residence of Frank Szeliga and his girlfriend, Kerri Cullinane. Torres had previously dated Szeliga. Torres asked Szeliga and Cullinane if they would like to go with her to the Anchor Inn. Szeliga and Cullinane declined. Torres then picked up her friend Epifanio Barrientos, and he accompanied her to the Anchor Inn. Torres dropped Barrientos off at his residence at approximately 11 p.m.

McLemore waited until approximately 8 p.m. for Torres to arrive at his residence. Between 8 and 9 p.m., Alvarado received a telephone call from McLemore, asking where Torres was. Alvarado received two more calls from McLemore that evening, asking where Torres was and sounding angrier with each call.

Between 8 and 10 p.m., Mentzer, Torres' brother, returned to Torres' residence, and Alvarado informed him she would be leaving once the children were asleep. Mentzer then went to his downstairs bedroom and went to sleep at approximately 10:30 p.m.

McLemore's attempts to reach Torres having proved unsuccessful, McLemore decided to walk to her house, a distance of 5 miles. McLemore took a knife with him. Alvarado left Torres' residence at 12:04 a.m. on September 2, 1997.

As she was leaving, she saw McLemore walking toward the residence with a bottle of beer in his hand. McLemore, wanting to make sure Alvarado was not coming back, waited outside Torres' residence for 20 minutes. He then entered Torres' residence and was inside the residence for approximately 20 minutes. During that time, McLemore was angry and began slicing up Torres' living room furniture with his knife and strewing the stuffing over the living room floor.

At 12:45 a.m. Torres' neighbors, Rodney and Joanne Givens, were awakened by a woman's screaming for help. Looking out their bedroom window, the Givenses saw a woman they recognized as Torres struggling with a man whom they did not recognize. Joanne Givens went to the kitchen and called the police. The Givenses then saw the man putting Torres into the passenger side of Torres' car and driving away. The Givenses' son Drew, who also witnessed the incident, heard a woman screaming for help and a man saying, "[H]ow could you do this to me, bitch?" When Drew looked out the window, he witnessed the man and woman struggling. All three of the Givenses noticed that the man was holding a shiny object which he eventually put behind his back, into his belt or pants. It was dark and raining at the time the Givenses witnessed this incident, and the Givenses gave varying physical descriptions of the male they saw struggling with Torres.

Louisa Smith, another of Torres' neighbors, was also awakened at 12:45 a.m. by a woman screaming for help. Upon looking out her window, Smith witnessed a man chasing a woman in the street, both falling to the ground, and the man putting the woman into a car and driving away. Smith could not identify either of the people involved in the struggle because they were too far away, and it was dark outside.

At approximately 2 a.m., Mentzer awoke and went upstairs. At that time, he noticed the living room furniture had been cut up and the stuffing strewn around the room. He also noticed a pair of black tennis shoes in the living room, which he recognized as belonging to McLemore. Mentzer later called the police and several family members.

Police discovered Torres' purse in the front yard of Torres' residence. The purse had a small amount of blood on it. Small amounts of blood were also found in the entryway to Torres' house.

At approximately 5 a.m. on September 2, 1997, several of Torres' family members went to McLemore's apartment complex looking for Torres. At that time, they encountered McLemore outside and asked him if he knew where Torres was. McLemore responded that he would "check [his] Caller I.D." and then ran behind the apartment complex and did not return while Torres' family members were outside.

On the morning of September 3, 1997, McLemore was arrested in connection with Torres' disappearance. At noon on September 3, Det. Michael Hoch was called to the Omaha police station to interview McLemore. During the interview, McLemore stated that Torres was supposed to come to his residence on the evening of September 1 but that she did not arrive. He admitted that he called Torres' residence three times looking for her. He stated that he became angry and decided to walk to Torres' house, taking a knife with him and stopping along the way to purchase a bottle of beer. A bottle of beer was found on a picnic table in Torres' backyard. McLemore admitted that he had been at Torres' residence from 12:04 to 12:45 a.m. on September 2 and that he had sliced up Torres' furniture, cutting his finger in the process. He stated that he left the residence at 12:45 a.m. and began walking home, discarding the knife along the way.

McLemore also told Hoch that later in the day on September 2, 1997, while at a schoolyard drinking alcohol and looking at a photograph of Torres, McLemore became despondent and attempted suicide by cutting his wrists. However, the wounds stopped bleeding, and McLemore then walked back to his apartment complex, where he was later arrested.

After the interview with Hoch, McLemore was booked by detention technician Brenda Rocha. During the process of booking McLemore, Rocha asked

McLemore what brought him to town. McLemore responded, "This girl." McLemore then stated, referring to "this girl," that he drove her car, that his fingerprints would be in her car, and that his hair would be on her. Upon noticing the cuts on McLemore's wrists, Rocha asked McLemore why he did that. McLemore responded, "I loved that girl. I loved her." McLemore did not identify by name the "girl" he was referring to.

After McLemore was arrested on September 3, 1997, police searched McLemore's apartment, taking certain items into evidence, including a black belt and several items of McLemore's clothing retrieved from a closet area. The black belt was later identified by Alvarado as the belt Torres was wearing when she went out on the evening of September 1.

At approximately 10:30 p.m. on September 3, 1997, Torres' car was found in the parking lot of a dentist's office located a few blocks from McLemore's apartment complex. The car had been in the parking lot since the morning of September 2. The car was towed to police headquarters where the trunk was opened. Torres' body was found inside the trunk.

Torres' death resulted from internal and external bleeding due to 54 to 56 cutting and stabbing wounds to the left side of the face, neck, chest, abdomen, and upper extremities. These wounds included a stab wound to the chest which penetrated Torres' heart, several stab wounds to the abdomen which penetrated her intestines, and a significant cutting wound to the neck which cut into the larynx. The wounds to the arms and hands were "defensive wounds," which Torres sustained while trying to defend herself from the assault.

On January 9, 1998, McLemore was charged with first degree murder and use of a weapon to commit a felony in connection with Torres' murder. On January 14, 1999, McLemore filed a motion to preclude the State from making any reference at trial to his previous conviction and incarceration which had occurred in another state. The trial court sustained the motion on January 19.

On June 21, 1999, the day trial was scheduled to begin, McLemore made a motion for continuance to allow McLemore to secure testimony from Roxanne Berres, a former girlfriend of Szeliga, in order to establish a "pattern of violence against women" by Szeliga. The trial court overruled the motion and determined that Berres' testimony was not relevant and was inadmissible under Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 1995). The State then made a motion in limine with respect to Berres' anticipated testimony, claiming the testimony was irrelevant. The trial court sustained the motion.

The case proceeded to trial, beginning on June 21, 1999. Evidence admitted at trial showed that blood found in Torres' house, in Torres' car, and on Torres' purse and clothing matched only Torres' blood. Blood found on McLemore's clothing recovered from the closet area of McLemore's apartment matched only McLemore's blood. Torres' car was examined for fingerprints by Donald Veys, a criminalist for the Omaha Police Department. Veys testified that environmental factors, such as the passage of time and moisture, can destroy fingerprints, and that the only print recoverable from Torres' car was a palm print, which could not be matched to Torres, McLemore, or any other suspects.

The State elicited testimony from several witnesses regarding statements Torres made to them about her fear of McLemore and statements McLemore had made regarding his feelings toward Torres. Such testimony included testimony from Mentzer that Torres told him that "she was concerned with her safety" because "of a statement [McLemore] made." This testimony was admitted without objection.

Carolyn Ludwig and Terri Holcomb, friends of Torres, also testified that Torres had told them she was afraid of McLemore. Holcomb testified that on August 31, 1997, Torres told her that McLemore "was very controlling, that she was afraid of him, and that she wanted to break it off with him." Holcomb further testified that on that same day, she and Torres were discussing Torres' husband's wanting to get back together with Torres. Holcomb then testified that McLemore interjected at that point, stating, "if he couldn't have her, nobody could have her." This testimony was

admitted without objection. Ludwig testified, without objection, that toward the end of August, McLemore told her he was in love with Torres and "[w]ould never let her go." Ludwig also testified that on August 31, Torres told her in reference to McLemore, "She was scared of him. She did not want to go with him." Finally, Ludwig testified, again without objection, that McLemore stated in reference to Torres that "if he couldn't have her, nobody was going to have her."

Evidence was also adduced regarding McLemore's behavior on the morning and early afternoon of September 2, 1997. Donald Grimm, a former roommate of McLemore, testified that around 8:30 a.m. on September 2, McLemore came to Grimm's residence and told Grimm that Torres was missing. During Grimm's testimony, the following exchange took place:

[Prosecution:] . . . What did he say about his standpoint after he told you that?

[Grimm:] He told me that they would probably try to blame him—

Q. Okay.

A. —because he—

Q. I'm sorry, go ahead.

A. Because the shit he was in before, you know, for down in North Carolina.

Defense counsel objected on the basis that the testimony was in violation of the pretrial order because it alluded to McLemore's prior conviction and incarceration. The trial court overruled the objection. After Grimm's testimony, McLemore made a motion for mistrial based on this testimony. In ruling on the motion for mistrial, the court stated "[T]he statement, itself, doesn't violate any of our pretrial orders in this case, as I indicated, nothing about prior convictions, nothing about prior incarcerations. The motion will be overruled."

Theresa Spivey, controller of the company where McLemore was employed, testified that on the morning of September 2, 1997, McLemore came to his workplace and gave his resignation. Spivey testified that McLemore indicated the reason he quit his job was "he would be going away for a long time and would not be able to work any longer." Evan McPhillips, the leasing agent at McLemore's apartment complex, testified that between noon and 1 p.m. on September 2, he received a telephone call from McLemore. McLemore told McPhillips that he would not be able to continue his lease because "he and his girlfriend had gotten into a fight and that he thought he might be going to jail."

Willie Martin, an inmate housed in the same area as McLemore at the Douglas County correctional facility from September 16 to October 10, 1997, testified about conversations Martin had had with McLemore regarding Torres' murder. Martin had been previously convicted of four felonies and had three previous convictions for giving false information.

Martin testified that 2 to 3 days after McLemore's arrival at the facility, McLemore told him that he had been charged with criminal mischief for entering the home of a woman he had been dating and cutting up her furniture. McLemore told Martin that the woman was a real estate agent who had several children. Martin further testified that McLemore stated that one day when it was "pouring down rain," McLemore had placed several telephone calls to the woman's house but was unable to reach her. McLemore told Martin that he became angry when he could not reach the woman because he believed that she was with another man.

Martin testified that McLemore stated that he then started walking to the woman's house in the rain and entered the house through an unlocked patio door. Martin testified that McLemore stated that he became angry while waiting for the woman and cut up her furniture with a knife he had brought with him, cutting his finger in the process. McLemore then stated that the woman came home and that a struggle ensued. McLemore told Martin that he forced the woman outside and into her car. Martin testified that McLemore stated that "the bitch kept talking shit so I

had to do something to her" and that he and the woman then "drove somewhere" in her car. McLemore told Martin that he "wasn't going to let her walk out of his life" and that he pulled out a knife and cut the woman's throat. McLemore told Martin that he put the woman's body in the trunk of the car and that McLemore knew that his fingerprints were in the car. McLemore stated that he left the car parked in the rain and started walking home, throwing the knife away as he walked. At the time Martin had these conversations with McLemore, the police had not released any information about how Torres had died.

Martin testified that a few days after McLemore told him these things, he saw news reports dealing with Torres' death. At that time, he realized that this was the woman McLemore had been telling him about and contacted the police to give them the information.

At the beginning of McLemore's case in chief, when it appeared that he was going to call Szeliga as a defense witness, the State made a motion in limine regarding a sexual encounter between Torres and Szeliga which allegedly occurred sometime during the week of Torres' murder. The court overruled the State's motion. However, McLemore then decided not to call Szeliga as a defense witness. McLemore also made an offer of proof regarding Berres' testimony. The trial court again found the testimony irrelevant and sustained the State's objection to such testimony.

The defense introduced testimony from one of its witnesses stating that when Torres stopped by Szeliga and Cullinane's residence on the evening of September 1, 1997, Torres spoke with only Szeliga. The State later called Szeliga as a rebuttal witness for the purpose of rebutting this testimony. Prior to presenting Szeliga's testimony, the State made a motion that McLemore's cross-examination of Szeliga be limited to the scope of direct examination and that McLemore not ask Szeliga any questions regarding the alleged sexual encounter with Torres the week of the murder. The court sustained the motion. Szeliga then testified that both he and Cullinane spoke with Torres when Torres stopped by.

After Szeliga's rebuttal testimony, McLemore made an offer of proof regarding questions he would have asked Szeliga on cross-examination. McLemore claimed he would have asked whether Szeliga had lied to a police detective, initially telling the detective that he did not have a sexual encounter with Torres the week of the murder, but later admitting to the detective that such an encounter had occurred. McLemore claimed that the purpose of such questioning was to impeach Szeliga's credibility. The State objected to the offer of proof, claiming that such testimony would be beyond the scope of direct examination and that McLemore could have adduced this testimony had he chosen to call Szeliga during his case in chief. The court agreed with the State's analysis and sustained the State's objection to the offer of proof.

The jury found McLemore guilty of first-degree murder and use of a deadly weapon to commit a felony, and he was sentenced to life in prison on the murder conviction and not less than nor more than 20 years' imprisonment for use of a weapon.

## B. Direct Appeal

McLemore appealed his convictions and sentences to the Nebraska Supreme Court. (Filing No. 4-3 at CM/ECF p. 2.) McLemore was represented by different counsel (Karen A. Bates-Crouch) on appeal than at trial. McLemore claimed that the trial court erred in (1) failing to grant his motion to dismiss and in accepting the guilty verdicts when the evidence was insufficient to sustain the convictions, (2) not excluding altered testimony of eyewitnesses, (3) failing to grant his motion for mistrial due to Grimm's mention of the "North Carolina" incident, (4) admitting certain hearsay testimony, and (5) not allowing him to present evidence regarding the past domestic abuse incident between Szeliga and Berres and not allowing him to cross-examine Szeliga regarding the alleged sexual encounter with Torres. (Filing No. 4-4 at CM/ECF pp. 15-16.) McLemore also asserted that his constitutional rights were violated due to ineffective assistance of trial counsel. (Filing No. 4-4 at CM/ECF p. 16.)

In a published opinion dated March 23, 2001, the Nebraska Supreme Court affirmed McLemore's convictions and sentences. (Filing No. 4-1.) The court did not address McLemore's ineffective assistance of trial counsel claim because it was not raised or ruled upon at the trial court level, and the record was insufficient to adequately review it. (Filing No. 4-1 at CM/ECF p. 15.) The Nebraska Supreme Court issued its mandate on April 4, 2001. (Filing No. 4-3 at CM/ECF p. 3.)

## C. First Postconviction Action

McLemore, through his then counsel, Bates-Crouch, filed a verified motion for postconviction relief on January 25, 2002 (filing no. 4-13 at CM/ECF pp. 2-43) and a verified addendum to the postconviction motion on February 25, 2003 (filing no. 4-13 at CM/ECF pp. 51-103). The motion and addendum included, inter alia, various claims of ineffective assistance of trial counsel, prosecutorial misconduct, and Confrontation Clause violations. (Filing No. 4-13 at CM/ECF pp. 2-43, 51-103.)

Bates-Crouch withdrew from her representation of McLemore on October 16, 2007. (Filing No. 4-13 at CM/ECF p. 142.) The state district court appointed new counsel, Matthew Kahler, to represent McLemore in the postconviction matter. (Filing No. 4-13 at CM/ECF p. 142.) On April 3, 2013, McLemore, through Kahler, filed a verified second addendum to the postconviction motion, alleging that appellate counsel (Bates-Crouch) was ineffective for failing to raise certain claims on direct appeal, including ineffective assistance of trial counsel claims. (Filing No. 4-13 at CM/ECF pp. 156-58.)

An evidentiary hearing was held on the issues set forth in McLemore's postconviction motion and addendums. (Filing No. 4-26.) In a written order entered February 13, 2015, the state district court denied postconviction relief. (Filing No. 4-13 at CM/ECF pp. 142-52.) McLemore appealed to the Nebraska Supreme. Shortly after the appeal was filed, Kahler sought and was given leave to withdraw from his representation of McLemore. (Filing No. 4-3 at CM/ECF pp. 5-6.)

McLemore, proceeding pro se, appealed to the Nebraska Supreme Court, arguing that the state district court erred in denying postconviction relief because (1) the State engaged in prosecutorial misconduct by eliciting false testimony at trial and mischaracterizing evidence during closing and rebuttal; (2) he received ineffective assistance of trial and appellate counsel in various respects; and (3) his Confrontation Clause rights were violated by the admission of hearsay testimony. (Filing No. 4-2 at CM/ECF p. 2; Filing No. 4-7 at CM/ECF p. 7.)

The Nebraska Supreme Court affirmed the judgment of the district court in a memorandum opinion dated June 15, 2016. (Filing No. 4-2.) The mandate issued on June 29, 2016. (Filing No. 4-3 at CM/ECF p. 6.)

**D. Second Postconviction Action**

On July 14, 2016, McLemore filed a pro se second verified motion for postconviction relief. (Filing No. 4-14 at CM/ECF pp. 201-08.) McLemore alleged that Bates-Crouch rendered ineffective assistance both on direct appeal and in the first postconviction action. (Filing No. 4-14 at CM/ECF pp. 201-04, 207.) Largely, McLemore asserted that Bates-Crouch was ineffective for failing to raise claims of ineffective assistance of trial counsel and prosecutorial misconduct on direct appeal. (Filing No. 4-14 at CM/ECF pp. 201-04, 207.) McLemore also alleged that Kahler rendered ineffective assistance in the first postconviction action for failing to raise claims of ineffective assistance of appellate counsel. (Filing No. 4-14 at CM/ECF pp. 204-05, 207.)

The State filed a motion to dismiss McLemore's successive postconviction motion, asserting that ineffective assistance of postconviction counsel is not a basis for postconviction relief and that all other claims were procedurally barred. (Filing No. 4-14 at CM/ECF pp. 210-13.) In response, McLemore filed an "Amended Verified Addendum to Second Verified Motion for Postconviction Relief" and a "Second Amended Verified Addendum to Second Verified Motion for Postconviction Relief," arguing that the Supreme Court decisions in *Martinez v.*

*Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), and the actual-innocence gateway exception required the court to excuse his procedural default. (Filing No. 4-14 at CM/ECF pp. 214-22, 233-37.)

In a written order entered January 4, 2018, the state district court denied McLemore's second motion for postconviction relief without an evidentiary hearing. (Filing No. 4-14 at CM/ECF pp. 238-40.) The court concluded that McLemore could not "successfully claim ineffective assistance of postconviction counsel" because "'[t]here is no constitutional guarantee of effective assistance of counsel in a postconviction action and therefore no claim for ineffective assistance of counsel.'" (Filing No. 4-14 at CM/ECF p. 239 (quoting *State v. Hessler*, 850 N.W.2d 777, 785-86 (Neb. 2014).) Additionally, the court found that the second postconviction action was barred by Nebraska's statute of limitations, Neb. Rev. Stat. § 29-3001(4) (West), and that all the other issues raised in the second postconviction motion were either litigated or could have been litigated in the first postconviction proceeding because they were "'known or knowable'" when he filed his first postconviction action. (Filing No. 4-14 at CM/ECF pp. 239-40 (quoting *State v. Sims*, 761 N.W.2d 527 (Neb. 2009).)

McLemore appealed to the Nebraska Supreme Court. (Filing No. 4-3 at CM/ECF p. 8; Filing No. 4-9.) The State filed a motion for summary affirmance. (Filing No. 4-3 at CM/ECF p. 9; Filing No. 4-10 at CM/ECF pp. 2-12.) On October 18, 2018, the Nebraska Supreme Court sustained the State's motion and summarily affirmed the judgment of the state district court. (Filing No. 4-10 at CM/ECF p. 1.) In so doing, the Nebraska Supreme Court stated:

> There is no constitutional guarantee of effective assistance of post conviction counsel, and therefore no claim of ineffective assistance of post conviction counsel. *State v. Hessler*, 288 Neb. 670, 850 N.W.2d 777 (2014). To the extent other claims are raised, they are time-barred. See Neb. Rev. Stat. § 29-3001(4).

([Filing No. 4-3 at CM/ECF p. 9](#); [Filing No. 4-10 at CM/ECF p. 1](#).) The mandate issued on November 5, 2018. ([Filing No. 4-3 at CM/ECF p. 9](#).)

**E. Habeas Petition**

McLemore filed his Petition in this court on December 7, 2018. ([Filing No. 1](#).) On March 27, 2019, McLemore filed a motion to stay so he could return to state court to present additional evidence of his innocence. ([Filing No. 8](#).) McLemore's motion had two attachments. The first attachment was a copy of a notarized statement of Jessup Smith dated February 20, 2003. ([Filing No. 8 at CM/ECF pp. 5-7](#).) The Smith statement asserted that Smith and Martin fabricated what Martin said at trial. According to Smith, they were able to do so from reports in the news about the facts of the case and what the police had told them. The second document was a partially transcribed taped interview of Willie Martin on December 8, 2018. ([Filing No. 8 at CM/ECF pp. 8-45](#).) The interview purported to be conducted by a private investigator for McLemore but there was no affidavit attesting to the document's authenticity. ([Filing No. 16 at CM/ECF p. 3](#).) Nor did it contain the entire interview. Additionally, slightly more than six minutes of the interview are, according to the transcript, inaudible. The court previously summarized the taped interview, which was "long, wandering, and sometimes incomprehensible or irrelevant":

> Martin partially recanted his testimony at trial. Martin said that [McLemore] said he wanted to rob the victim, a woman who had ended a relationship with him making him angry, and when she came home unexpectedly and tried to call the police he wrapped a phone cord around her neck 3 or 4 times and she passed out. However, Martin said that [McLemore] told him: "'I never cut her throat, but I did strangle her, but she wasn't dead.'"
>
> Martin also stated that, according to [McLemore], other men were involved who [McLemore] mentioned but refused to identify because "'I'm not no snitch [. . .].'" After [McLemore] and the others put the unconscious victim in the trunk of a car, they went to do drugs at [McLemore's] apartment. When [McLemore] and the other men exited the apartment they heard the victim knocking from the car trunk and

sometime thereafter that is when at least one of the other men cut her throat.

Martin said that [McLemore] admitted stabbing the woman's couch–thus admitting that he possessed a knife and was angry and violent. Martin told the private investigator that [McLemore] said that "'they cut her throat *for me*.'" Martin then reiterated: "From the whole story he told me, *and I could tell that whole story again, his dope friends cut her throat for him*, or they cut her throat because . . . I don't know."

Martin told the private investigator that the police did not feed him facts or give him anything for his cooperation. Martin also told the private investigator that he did not rehearse his story with Smith in order to get them straight when the men talked to the police. Martin speculated that Smith may have heard the same things that Martin heard from [McLemore] while the men [were] in the day room of the jail. Martin specifically denied that he was acting as an agent for the state.

The private investigator did not confront Martin with his actual trial testimony. He did not ask Martin to explain his actual trial testimony, particularly that part of the testimony where Martin swore that [McLemore] admitted he had cut the victim's throat. Moreover, the private investigator was leading and suggestive. Still further, the private investigator assured Martin that he could not be prosecuted. For example, near the beginning of the interview the private investigator states:

> Turns out the case is falling apart. [. . .] Jessup has retracted his confession from what he heard and all these kinds of things. The state's case is falling apart. The DNA evidence, the blood evidence, all this. *It doesn't look like this guy did it. It looks like they set you up with bad information to testify on. It's way beyond the statute of limitations. Nobody can harm you, nothing*, but this guy has been in for twenty years. He's looking at life, the rest of his life, and everything points to the fact that this guy didn't do it. The police experts, the DNA guys, the crime scene guys . . . everything's coming apart.

(Filing No. 16 at CM/ECF pp. 3-5 (internal citations omitted).)

On June 4, 2019, the court denied the motion to stay, finding various reasons why staying the case so that McLemore "might return for the third time to a state post-conviction court would be a waste of time." (Filing No. 16 at CM/ECF p. 6.) Those reasons included:

> **_Reason 1._** The Smith affidavit, dated February 20, 2003, is old news. It was used as a basis for one of [McLemore's] state post-conviction motions. (Filing no. 4-13 at CM/ECF pp. 122-123; filing no. 4-9 at CM/ECF p. 41.) It is highly unlikely that the Nebraska state courts would find that affidavit standing alone sufficient to support consideration of yet another post-conviction action (or motion for new trial) since it had already been presented at least once before in an unsuccessful post-conviction action.

> **_Reason 2._** The 2018 partially transcribed but unsigned interview of Martin cannot be relied upon. Portions were inaudible (over six minutes) and the transcript is otherwise incomplete. As noted, the private investigator failed to confront Martin with his trial testimony or ask Martin to explain it and the investigator was leading and suggestive. He even assured Martin that he could not be prosecuted. Additionally, the partially transcribed interview is not authenticated as required by our rules. NECivR 7.1(a)(2)(C) ("An affidavit must identify and authenticate any documents offered as evidence. The affidavit must be made on personal knowledge, set forth facts admissible in evidence, show affirmatively that the affiant is competent to testify to the matters stated, and identify the related motion.") Accordingly, [the court] give[s] the partially transcribed interview no weight since it is untrustworthy.[3]

> **_Reason 3._** Even if one were to consider the 2018 partially transcribed interview, it would not establish [McLemore's] innocence of the murder. As the Nebraska Supreme has made clear, "even if a defendant has not actually killed a victim, substantial participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the constitutional culpability requirement for a

---

[3] McLemore has since filed an affidavit of the private investigator in an effort to authenticate the transcribed interview. (Filing No. 31.) The affidavit does not alter the court's earlier assessment of the interview.

conviction of first degree murder . . . ." *State v. Lotter*, 771 N.W.2d 551, 564 (Neb. 2009) (footnote omitted).

An impartial reading shows that Martin described the following admissions made by [McLemore] to him: (a) that [McLemore], estranged from the woman and angry, went to her house to rob her and that he also stabbed the woman's couch with a knife thus displaying a violent propensity to use a knife; (b) that [McLemore] attempted to strangle the woman, when she came home unexpectedly, by wrapping a phone cord around the woman's neck three or four times when she tried to call the police–she passed out as a result; (c) that [McLemore] and some male friends then put her in the trunk of a car; (d) that the group went to [McLemore's] apartment; (e) that the group did drugs together; (f) that after doing drugs, the group exited the apartment; (g) that the group heard the victim knocking from inside the car trunk evidently to their surprise; and (h) that one or more of [McLemore's] accomplices "cut her throat for me [McLemore]."

***Reason 4.*** It is quite unlikely that the Nebraska courts would give credence to Martin's unauthenticated and unsworn recantation. As stated by the Nebraska Supreme Court, "It has been said that there is no form of proof so unreliable as recanting testimony.' The opportunity and temptation for fraud are so obvious that courts look with suspicion upon such an asserted repudiation of the testimony of a witness for the prosecution, and this is so even though the repudiation be sworn to.'" *Id.* at 563 (defendant was not entitled to successive post-conviction relief based upon codefendant's affidavit, stating that he committed perjury at defendant's trial and that he, not defendant, actually killed the victims) (citations and footnotes omitted). In this case, we do not even have a sworn affidavit.

***Reason 5.*** If [McLemore] tried to bring yet a third post-conviction action in the Nebraska courts, it is highly likely that he would be procedurally barred from doing so. As early as 2003, [McLemore] knew from Smith's sworn statement (affidavit) that Martin had allegedly lied. And, as noted earlier, Smith's sworn statement was presented in a prior post-conviction action.

The Nebraska Supreme Court has long held that the courts of Nebraska "will not entertain a successive motion for postconviction relief unless

the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Moore*, 718 N.W.2d 537, 542 (Neb. 2006) (citation omitted). Since [McLemore] knew of the claim of Martin's alleged perjured testimony in 2003, and in fact presented the Smith affidavit in a prior postconviction action, [the court] [is] not persuaded that Nebraska would consider another postconviction action based upon the assertion that Martin partially recanted his 1999 trial testimony in 2018 and thus allegedly implicated himself in the perjury that Smith had alleged. In other words, [McLemore] would be procedurally barred under Nebraska law because he knew of the alleged perjury in 2003 and did nothing for nearly 15 years to pursue the matter further.

***Reason 6.*** Nebraska has a statute of limitations of one year for postconviction motions. Neb. Rev. Stat. Ann. § 29-3001(4) (West). Given the passage of time in this case between the 1999 conviction and 2018 unsworn and unauthenticated interview of Martin and the fact that [McLemore] knew of the alleged perjury by virtue of the 2003 Smith statement, [the court] think[s] it highly unlikely that a Nebraska court would conclude that [McLemore] "exercise[d] . . . due diligence" in procuring the Martin transcribed interview. Thus, [McLemore] could not avoid the one-year statute of limitations. Indeed, when summarily affirming the denial of [McLemore's] second postconviction action the Nebraska Supreme Court concluded the action was time-barred.

***Reason 7.*** Assuming, without deciding, that the unauthenticated and unsworn transcription of Martin's 2018 interview is "new evidence" within the meaning of Neb. Rev. Stat. Ann. § 29-2103(4) (West) and that [McLemore] exercised due diligence, [the court] conclude[s] that it is highly unlikely that a Nebraska court would, pursuant to that statute, grant a new trial based upon such evidence. Even if the Martin interview were considered "new evidence" and [McLemore] was considered to have been diligent, [McLemore] would still have to show that the interview was "evidence so substantial that a different result may have occurred." "Reasons 2, 3 and 4" set forth above convince [the court] that the interview would be declared wholly insubstantial by a Nebraska court considering a motion for new trial.

(Filing No. 16 at CM/ECF pp. 6-9 (footnotes and internal citations omitted).)

On June 26, 2019, McLemore filed a Motion to Amend his Petition. ([Filing No. 18](.).) The court granted the motion only to the extent that it added Claim Five. ([Filing No. 22](.).) In response to the Petition, Respondent filed an Answer ([filing no. 25](.)), a Brief ([filing no. 26](.)), and the relevant state court records ([filing no. 4](.)). Respondent argues that the claims are either procedurally defaulted and/or without merit. ([Filing No. 26](.).) McLemore filed a brief ([filing no. 35](.)) in response to Respondent's Answer.[4] After the court granted the Respondent's motion for extension of time to file a reply brief ([filing no. 41](.)), Respondent filed his reply on January 3, 2020 ([filing no. 46](.)). This matter is fully submitted for disposition.

### III. OVERVIEW OF APPLICABLE LAW

Various strands of federal habeas law intertwine in this case. They are (1) exhaustion and procedural default; (2) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court; and (3) the standard for evaluating a claim of ineffective assistance of counsel. The court elaborates upon those concepts next so that it may apply them later in a summary fashion as it reviews McLemore's claims.

---

[4] On December 4, 2019, McLemore filed an interlocutory appeal of the court's order ([filing no. 36](.)) denying his motion for disqualification of the undersigned judge ([filing no. 33](.)) and his "Motion to Produce" additional documents ([filing no. 32](.)). ([Filing No. 37](.).) The court certified that the interlocutory appeal was not taken in good faith and determined that McLemore could not appeal in forma pauperis "because (1) the purported interlocutory appeal of the predicate rulings [was] frivolous just as the predicate motions were frivolous and (2) also because the attempted interlocutory appeal [was] asserted in bad faith for the purpose of delaying the progression of this case." ([Filing No. 39](.).) McLemore then filed a motion for leave to appeal in forma pauperis ([filing no. 47](.)), which the court denied on January 14, 2020, for the reasons previously stated ([filing no. 48](.)). On January 21, 2010, the Eighth Circuit dismissed McLemore's appeal for lack of jurisdiction. ([Filing No. 49](.).)

**A. Exhaustion and Procedural Default**

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented to the trial court, and then in an appeal to either the Nebraska

Supreme Court directly[5] or to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or

---

[5] Where a life sentence has been imposed in a criminal case, the appeal goes directly to the Nebraska Supreme Court. Neb. Rev. Stat. § 24-1106 (West).

demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Also, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). To invoke the actual innocence exception, a petitioner "must show that in light of all the evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Jennings v. United States*, 696 F.3d 759, 764-65 (8th Cir. 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 327, (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

## B. Nebraska Law Relevant to Procedural Default

Under Nebraska law, you don't get two bites of the postconviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased.")

Moreover, a person seeking postconviction relief must present his or her claim to the district court or the Nebraska appellate courts will not consider the claim on appeal. *State v. Deckard*, 722 N.W.2d 55, 63 (Neb. 2006) (denying postconviction relief in a murder case and stating: "An appellate court will not consider as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief.") Similarly, on appeal, the appealing party must both assign the specific error and specifically argue that error

in the brief. Otherwise the claim is defaulted under Nebraska law. *State v. Henry*, 875 N.W.2d 374, 407 (Neb. 2016) (stating an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court).

Note also that Nebraska has a statute of limitations for bringing postconviction actions that is similar to federal law. It reads:

(4) A one-year period of limitation shall apply to the filing of a verified motion for postconviction relief. The one-year limitation period shall run from the later of:

(a) The date the judgment of conviction became final by the conclusion of a direct appeal or the expiration of the time for filing a direct appeal;

(b) The date on which the factual predicate of the constitutional claim or claims alleged could have been discovered through the exercise of due diligence;

(c) The date on which an impediment created by state action, in violation of the Constitution of the United States or the Constitution of Nebraska or any law of this state, is removed, if the prisoner was prevented from filing a verified motion by such state action;

(d) The date on which a constitutional claim asserted was initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court, if the newly recognized right has been made applicable retroactively to cases on postconviction collateral review; or

(e) August 27, 2011.

Neb. Rev. Stat. § 29-3001(4) (West).

## C. Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06. Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

## D. The Especially Deferential *Strickland* Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for offenders to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

*Strickland* applies equally to appellate counsel, and appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1153

(2016) (a "fairminded jurist" could have concluded that repetition of anonymous tip in state-court cocaine-possession trial did not establish that the uncontested facts it conveyed were submitted for their truth, in violation of the Confrontation Clause, or that petitioner was prejudiced by its admission into evidence, precluding federal habeas relief under Antiterrorism and Effective Death Penalty Act (AEDPA); Petitioner could not establish that Petitioner's appellate counsel was ineffective, as appellate counsel was entitled to the "benefit of the doubt"). To demonstrate prejudice on account of appellate counsel's failure to raise a claim on appeal, a petitioner must show a "reasonable probability that an appeal of [the] issue would have been successful and that the result of the appeal would thereby have been different." *Pryor v. Norris*, 103 F.3d 710, 714 (8th Cir. 1997). The petitioner must show more than that the alleged error had some conceivable effect on the outcome of the proceeding. *Id.* at 713. "'Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.'" *Id.* (quoting *Strickland*, 466 U.S. at 693).

## IV. DISCUSSION

### A. Ineffective Assistance of Trial Counsel Claims

In Claim One, McLemore asserts multiple instances of ineffective assistance of trial counsel.

In McLemore's first postconviction action, both the state district court and the Nebraska Supreme Court addressed his ineffective assistance of trial counsel claims in the context of claims that appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel claims on direct appeal.[6] (Filing No. 4-2 at

_____

[6] The Nebraska Supreme Court explained:

McLemore raises various claims that his trial counsel was ineffective. McLemore was represented by different counsel on appeal than at trial,

CM/ECF pp. 4-5; Filing No. 4-13 at CM/ECF p. 144.) The Nebraska Supreme Court stated that when a case presents layered ineffective assistance claims, the court determines "the prejudice prong of appellate counsel's performance by focusing on whether trial counsel was ineffective under the *Strickland* test." (Filing No. 4-2 at CM/ECF pp. 5-6.) As the Nebraska Supreme Court explained, "[i]f trial counsel was not ineffective, then the defendant suffered no prejudice when appellate counsel failed to bring or properly raise an ineffective assistance of trial counsel claim." (Filing No. 4-2 at CM/ECF pp. 5-6.)

McLemore did not raise the allegations in Claim One as ineffective assistance of appellate counsel claims. Nonetheless, the court will review the individual

---

so he was required to raise claims of ineffective assistance of trial counsel on direct appeal in order to preserve them for postconviction review. [*State v. Casares*, 864 N.W.2d 667 (Neb. 2015); *State v. York*, 731 N.W.2d 597 (Neb. 2007).] The record shows that McLemore raised several ineffective assistance of trial counsel claims in his direct appeal, and we determined the record was insufficient to resolve the claims in that forum. It is unnecessary to analyze whether the allegations made on direct appeal were sufficient to preserve those claims for postconviction review, because McLemore also asserts that his appellate counsel was ineffective in failing to raise ineffective assistance of trial counsel claims on direct appeal.

This postconviction proceeding was McLemore's first opportunity to assert that his appellate counsel was ineffective. A claim of ineffective assistance of appellate counsel, which could not have been raised on direct appeal, may be raised on postconviction review. [*State v. Sellers*, 858 N.W.2d 577 (2015).] We conclude McLemore's claims that his appellate counsel was ineffective in failing to raise ineffective assistance of trial counsel claims on direct appeal are properly before us in this postconviction action. And we construe his allegations in that regard to broadly encompass all the ineffective assistance of trial counsel claims alleged in his postconviction motion.

(Filing No. 4-2 at CM/ECF pp. 4-5.)

ineffective assistance of trial counsel claims without delving into an analysis about whether the allegations raised in Claim One were presented to the Nebraska state courts under the same theory. *See Wemark*, 322 F.3d at 1021 (holding that, to exhaust a claim, a petitioner must present it to the state courts under the same theory in which it is later presented in federal court).

### 1. Wisecarver Testimony

In Claim One, Subparts (A)(1) and (A)(3),[7] McLemore contends that trial counsel rendered ineffective assistance by failing to object to, or cross-examine, the testimony of the State's DNA expert, Dr. James Wisecarver, and by failing to object to the State's reference to this testimony during its closing argument. (Filing No. 1 at CM/ECF p. 16.) McLemore alleges that Wisecarver testified that "the victim's clothing, worn [the] night [of her disappearance], were tested for DNA, and that only the victim's DNA was found on them." (Filing No. 1 at CM/ECF p. 16.) McLemore argues that Wisecarver's testimony was "false" because the "lab results showed the clothing was never tested." (Filing No. 1 at CM/ECF p. 16.)

When McLemore asserted this claim in his first postconviction appeal, the Nebraska Supreme Court determined that "McLemore's verified motion for postconviction relief did not raise this particular allegation to the district court" and that "there [was] no mention of this testimony of Wisecarver in the motion for postconviction relief or the addendum thereto."[8] (Filing No. 4-2 at CM/ECF pp. 6-7.) Thus, the Nebraska Supreme Court refused to consider the claim because it had

---

[7] In Claim One, Subpart (A)(3), McLemore asserts that trial counsel failed to object to the State's references in closing argument to "the DNA expert testimony." (Filing No. 1 at CM/ECF p. 16.) It is unclear to which DNA testimony McLemore is referring, but the court will assume that he is referring to the Wisecarver testimony that is mentioned in Claim One, Subpart (A)(1).

[8] In the addendum, McLemore mentioned Wisecarver's testimony in the context of prosecutorial misconduct claims. (Filing No. 4-13 at CM/ECF pp. 55-57.)

not been properly presented to the district court. ([Filing No. 4-2 at CM/ECF pp. 6-7](#) (citing *Thorpe*, 858 N.W.2d 880).) Because McLemore did not properly present the claim in the state courts and is procedurally barred from doing so now, this ineffective assistance of trial counsel claim is procedurally defaulted. *See Shaddy v. Clarke*, 890 F.2d 1016, 1018 (8th Cir. 1989) (where a Nebraska state court rejects a claim on state procedural grounds and issues a "'plain statement' that it is rejecting petitioner's federal claim on state procedural grounds," a federal habeas court is precluded from "reaching the merits of the claim").

Even assuming, however, that the claim is not procedurally barred or that the procedural default is excused, the claim is without merit. The testimony and argument before the jury was that Torres' clothing had been tested and that *only* Torres' DNA was found on the clothing. Arguably, this testimony inured to McLemore's benefit, or at least supported his argument that there was no DNA evidence linking McLemore to Torres' murder. As trial counsel explained in his deposition, if Wisecarver's testimony left the jury with the impression that Torres' clothing "had been tested and that there was none of [McLemore's] blood found on her [clothing], that that mistaken testimony was in favor of Mr. McLemore, and therefore it would not have been to [McLemore's] benefit to bring it to the jury's attention that Dr. Wisecarver had made a mistake." ([Filing No. 4-27 at CM/ECF p. 6](#).) The court will not second-guess trial counsel's reasonable strategic decision on this matter.

Moreover, McLemore is not entitled to postconviction relief on this claim because he cannot show prejudice from trial counsel's failure to impeach Wisecarver with the report. In order to show prejudice, McLemore must demonstrate a reasonable probability that but for trial counsel's deficient performance, the result of the proceeding would have been different. Even if trial counsel had objected to the testimony about Torres' clothing being tested, at most the jury would have been informed that the State did not provide any DNA evidence from Torres' clothing. This information would have done nothing to rebut the overwhelming evidence of McLemore's guilt detailed in the Nebraska Supreme Court's decision on direct

appeal, so there is no reasonable probability the result of the proceeding would have been different. Indeed, the Nebraska Supreme Court rejected McLemore's argument on direct appeal that the evidence was insufficient to convict him because there was no blood or DNA evidence connecting him to Torres' murder:

> The evidence supports the finding that McLemore intentionally killed Torres by using a deadly weapon in a manner likely to cause death. McLemore admitted to taking a knife with him to Torres' residence and to using the knife to cut Torres' throat. The evidence shows Torres suffered 54 to 56 cutting and stabbing wounds, sustaining significant injuries which caused her death, as well as defensive wounds sustained in attempting to fend off her attacker. From this evidence, a jury could reasonably find that McLemore intended to kill Torres by cutting and stabbing her with the knife.
>
> A jury could also reasonably find that McLemore killed Torres with premeditated and deliberate malice. The term "premeditated" means to have formed a design to commit an act before it is done. *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998). One kills with premeditated malice if, before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification. *State v. Sims*, *supra*. "Deliberate" means not suddenly, not rashly. *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995). Deliberation requires that the defendant considered the probable consequences of his or her act before doing the act. *Id.*
>
> The jury could reasonably find that McLemore formed a design to kill Torres prior to committing the act and that the act was not done suddenly or rashly. McLemore admitted to becoming angry with Torres after waiting for her to arrive at his apartment and placing several telephone calls to determine her whereabouts. McLemore then decided to walk 5 miles in the rain to Torres' residence, taking a knife with him, and waiting outside the house to make sure Alvarado was not coming back. He admitted to entering the house and destroying the furniture. When Torres came home, an altercation ensued, culminating in McLemore's putting Torres into her car and driving to another location, where he stabbed Torres to death. McLemore admitted to cutting Torres' throat and putting her body in the trunk of her car.

This evidence supports the jury's finding that the essential elements of first degree murder and use of a weapon to commit a felony existed beyond a reasonable doubt. The evidence was sufficient to find McLemore guilty of first degree murder and use of a weapon to commit a felony.

(Filing No. 4-1 at CM/ECF pp. 11-12.)

Additionally, in its opinion on postconviction appeal, the Nebraska Supreme Court identified an "overwhelming array of circumstantial evidence of McLemore's guilt":

This evidence included the fact that McLemore admitted becoming angry and walking 5 miles in the rain to Torres' residence with a knife. He admitted being at her home, with a knife, just before the crime, and to cutting up her furniture in a rage. Torres' car was found a few blocks from McLemore's apartment with Torres' body in the trunk, stabbed more than 50 times. When confronted by Torres' family members the next morning McLemore acted strangely and ran away. Witnesses testified to hearing McLemore state that if he could not have Torres, no one could. On the morning after the murder McLemore told a friend Torres was missing and McLemore expected he would be blamed. That same morning, he quit his job, telling his employer he "would be going away for a long time and would not be able to work any longer." McLemore then terminated his lease, telling the manager "he and his girlfriend had gotten into a fight and that he thought he might be going to jail."

(Filing No. 4-2 at CM/ECF p. 17.)

Based on the above, the court finds that Claim One, Subparts (A)(1) and (A)(3) are without merit and do not support postconviction relief.

**2. Palm Print Evidence**

In Claim One, Subpart (A)(2), McLemore claims that trial counsel was ineffective for failing to object to the "false testimony" of criminologist Donald Veys that "a palm print removed from the windshield of [Torres'] car was compared to a Frank Szeliga." (Filing No. 1 at CM/ECF p. 16.) McLemore asserts that the "report showed it was never tested." (Filing No. 1 at CM/ECF p. 16.)

In rejecting the claim on postconviction appeal, the Nebraska Supreme Court wrote:

> Torres' body was found in the trunk of her car. The windshield of the car had been cracked, and a "spider" pattern was on it. Near the lower left of this pattern, on the inside of the windshield, investigators discovered a palm print. At trial, a criminologist testified that the print was compared to the known prints of the victim, McLemore, and three others, including Frank Szeliga. The criminologist testified the print did not match any of the known comparisons. Part of McLemore's trial strategy was a theory that Szeliga killed Torres.

> In his brief, McLemore argues that the criminologist's report suggests the palm print was never actually compared to Szeliga because Szeliga's name is not referenced on the report. He contends trial counsel was ineffective in failing to object to the admission of what he describes as the criminologist's false testimony. And he alleges appellate counsel was ineffective in failing to present this issue on appeal.

> The postconviction court concluded the record affirmatively disproved this claim. It reasoned that trial counsel's deposition indicated the test comparing Szeliga's print to the palm print was done later, and so Szeliga's name would not have been reflected in the report relied upon by McLemore. Trial counsel testified he did not specifically remember why he did not impeach the criminologist with the report, but that it would not be unusual for the State to have done later testing on the palm print, particularly when McLemore's defense theory was that Szeliga was a suspect. Trial counsel also indicated, however, that he could

simply have made a mistake in not realizing the print was not actually compared to Szeliga.

We find no clear error in the postconviction court's finding that the record affirmatively disproves this claim. Moreover, even if we assume the palm print was not in fact compared to Szeliga and thus trial counsel performed deficiently in not impeaching the criminologist with the report, we still conclude McLemore is not entitled to postconviction relief on this claim because he cannot show prejudice. In order to show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. Even if trial counsel had objected to the testimony about the palm print comparison, at most the jury would have been informed that Szeliga was not affirmatively ruled out as a match to the print. That information would have done nothing to rebut the overwhelming circumstantial evidence of McLemore's guilt detailed above,[9] so there is no reasonable probability the result of the proceeding would have been different. This claim of ineffective assistance of counsel is without merit and does not support postconviction relief.

(Filing No. 4-2 at CM/ECF pp. 17-19 (footnote omitted).)

The court must grant substantial deference to the Nebraska Supreme Court's decision on this issue. First, McLemore did not rebut by clear and convincing evidence the Nebraska Supreme Court's determination that Veys' testimony was not "false." Thus, trial counsel was not deficient for failing to object to his testimony. Furthermore, the Nebraska Supreme Court reviewed all the evidence and determined, based on *Strickland*, that McLemore was not prejudiced by trial counsel's failure to object to the palm print evidence. McLemore did not establish that the Nebraska Supreme Court's decision on this issue was based on an unreasonable determination of the facts in light of the evidence or that it was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

---

[9] *See* recitation of the circumstantial evidence set forth in Discussion, Section IV.A.1, *supra* at p. 33.

McLemore advances a related argument in Claim One, Subpart A.3—that trial counsel rendered ineffective assistance by failing to object to the State's reference to Veys' testimony during closing argument. (Filing No. 1 at CM/ECF p. 16.) This claim was not specifically assigned as error in the Nebraska state courts and is therefore procedurally defaulted. Nonetheless, the claim is without merit. As discussed above, the Nebraska Supreme Court determined that the record disproved McLemore's claim that Veys' testimony was "false." McLemore did not rebut the Nebraska Supreme Court's finding of fact on this issue and, as stated previously in this order, the court must grant substantial deference to the Nebraska Supreme Court's finding. Thus, the court concludes that trial counsel's decision not to object to the State's reference to this testimony during closing argument was reasonable trial strategy. Furthermore, even assuming trial counsel performed deficiently in not objecting to the State's reference to Veys' testimony during closing argument, the court finds that McLemore is not entitled to habeas relief because he cannot show prejudice. Even if trial counsel had objected to the State's closing remarks about Veys' testimony, "at most the jury would have been informed that Szeliga was not affirmatively ruled out as a match to the print. That information would have done nothing to rebut the overwhelming circumstantial evidence of McLemore's guilt . . ., so there is no reasonable probability the result of the proceeding would have been different." (Filing No. 4-2 at CM/ECF p. 19.) Habeas relief is not warranted on this claim.

### 3. Willie Martin Testimony

In Claim One, Subpart (A)(4), McLemore asserts that trial counsel was ineffective for failing to impeach Willie Martin's testimony with media reports and chronological inconsistences in his story and for failing "to object during closing when the State argued that its witness, Willie Martin, possessed 'significant details' that only he could know." (Filing No. 1 at CM/ECF pp. 16-17.)

The court construes McLemore's claims as corresponding to McLemore's postconviction claims that trial counsel "was ineffective in various ways related to

the testimony of Willie Martin, a jailhouse informant." ([Filing No. 4-2 at CM/ECF p. 9](#).) The Nebraska Supreme Court, after recounting Martin's trial testimony as set forth in its opinion on direct appeal,[10] rejected these claims on postconviction appeal. The court wrote:

> McLemore presents several claims of ineffective assistance related to Martin's testimony. First, he argues trial counsel was ineffective in failing to object to the State's mischaracterization of Martin's trial testimony during closing argument. Next, he argues trial counsel was ineffective in failing to demonstrate and argue that much of the information to which Martin testified was previously reported by the media. Finally, McLemore argues his trial counsel was ineffective in failing to impeach Martin with chronological inconsistences in his story.

> Regarding McLemore's claim that counsel was ineffective in failing to object during closing argument, some additional background is necessary. During closing argument, the State remarked:

>> Another bit of information that Mr. Martin had that seems—maybe seems insignificant is that the Defendant tells him that the victim's brother didn't know I was in the house and that's when I cut up the furniture. Ed Mentzer was in the house. He was downstairs sleeping. None of this information was released. Mr. Martin gave that information to the police.

> The State also argued:

>> Mr. Martin was told by the Defendant that the furniture was cut up. The police didn't release that information. The only people with that information was the family and the officers who had been over to the house, the officers working on the case. Again, there were no details about her throat being cut or how many times she was stabbed or how she died.

---

[10] *See* recitation of Martin's trial testimony set forth in Background, Section II.A, *supra* at pp. 9-10.

McLemore contends these closing remarks misstated the evidence and his trial counsel was ineffective in failing to object. Specifically, he contends Martin did not testify at trial that McLemore told him the victim's brother was asleep downstairs. Our review of the record suggests McLemore is partially correct. Martin did not testify to this fact during trial, but Kevan Barbour, the officer who interviewed Martin about his discussions with McLemore, did. Barbour testified without objection that Martin learned from McLemore that Torres' brother did not know he was in the house, and that is when McLemore started cutting up the furniture. Barbour also testified without objection that from the date Torres went missing to the date on which McLemore was arrested, the police did not release any information about how Torres died. The State's closing remarks in this regard were therefore completely accurate and counsel was not ineffective for failing to object.

McLemore also argues trial counsel was ineffective in failing to demonstrate that much of the information to which Martin testified was also reported by the media. Media reports were offered into evidence during the postconviction hearing which generally show that information about the disappearance and death of Torres was reported to the general public weeks before Martin met McLemore, including information that Torres' couch had been cut up while her brother was asleep and that Torres' body had been discovered in the trunk of her car. However, the media reports also confirmed Barbour's trial testimony that police had not disclosed to the public how Torres died.

McLemore suggests that if trial counsel had addressed the media reports during trial, then Martin's credibility would have been significantly weakened. Our review of the record shows trial counsel did address the media coverage in his closing argument by stating:

> The State says, well, none of this stuff was out in the open. We don't know that. We know the police say that they didn't release the manner of her death, but we don't know what was on the news. We weren't shown copies of news coverage, we weren't shown copies of what was in the newspaper. We don't know what's out there.

In addition to addressing the media coverage during closing, trial counsel adduced evidence at trial suggesting an alternative explanation for how Martin may have learned Torres' throat was cut when this information was not reported in the media. Evidence was adduced that her family members knew this information and had communicated the manner of death to McLemore via telephone conversations which Martin could have overheard.

Although media reports in the record indicate some of the information surrounding Torres' death had been disseminated to the general public and trial counsel could arguably have made more specific use of this evidence, the entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable. When reviewing a claim of ineffective assistance of counsel, an appellate court will not second-guess reasonable strategic decisions by counsel. We note that the media reports were a double-edged sword, because while they may have permitted defense counsel to argue that some of the information Martin provided police was also reported in the media, the reports also would confirm that much of the information Martin provided police, including information regarding the manner of death, had not been publicized. We conclude on this record, as did the postconviction court, that trial counsel engaged in reasonable trial strategy with respect to the media reports and was not deficient.

Finally, McLemore argues his trial counsel was ineffective in failing to impeach Martin with chronological inconsistences in his story. The record shows Martin was first housed in a cellblock with McLemore on September 16, 1997. Police reports show Martin contacted the police on September 17, the day after he first met McLemore, indicating he wished to discuss information McLemore had given him regarding the death of Torres. Two days later, on September 19, Barbour interviewed Martin. Police reports in the record indicate Martin provided Barbour specific details regarding McLemore's relationship with Torres, including details about her family and home, McLemore's thoughts and actions on the night of the murder, the weather that evening, and McLemore's admission that he cut Torres' throat. At the end of the interview, Martin volunteered that he was confident McLemore would tell him additional information because he "could not stop talking about it."

McLemore highlights two chronological inconsistences in this evidence which he argues support his claim that trial counsel was ineffective. First, he emphasizes that during trial, Martin testified it took 2 or 3 days for McLemore to open up to him and tell him his story, yet Martin contacted police on September 17, the day after meeting McLemore, to provide information about Torres' death. Next, he emphasizes that media reports about Torres' disappearance and the discovery of her body first occurred on September 3rd and 4th, weeks prior to the time Martin allegedly first had contact with McLemore, but Martin testified at trial that he first heard new reports about Torres after talking with McLemore.

When trial counsel was asked in his deposition why he did not pursue these chronological inconsistencies in Martin's cross-examination, he explained:

> With a witness like Mr. Martin, it would certainly be my policy to try and bring up every inconsistency unless I felt it was, you know, pretty explainable. And the reason for that is that if I have major inconsistencies, I want to focus on that and I don't want to spend a whole lot of time on minor inconsistencies, because I think jurors can see through that. Little minor inconsistencies are just that, and I don't want to detract from what major inconsistencies there would be.

Counsel also admitted, however, that his failure to specifically point out chronological inconsistences in Martin's trial testimony may have been a misstep.

We conclude on this record that trial counsel engaged in reasonable trial strategy with respect to these inconsistencies and was not deficient. Moreover, on this record McLemore was not prejudiced. In order to show prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Even if trial counsel had more effectively impeached Martin's credibility by highlighting the chronological inconsistencies McLemore emphasizes now there remained an overwhelming array of circumstantial evidence of

McLemore's guilt.[11] . . . We conclude that even assuming trial counsel performed deficiently in a few limited respects, his deficient, performance did not result in a reasonable probability that the outcome of the trial would have been different.

(Filing No. 4-2 at CM/ECF pp. 9-17 (footnotes omitted).)

McLemore did not rebut, by clear and convincing evidence, the Nebraska Supreme Court's findings of fact on this issue. Trial counsel's decisions regarding cross-examination and impeachment of Martin, and his decision not to object to the State's argument during closing, were squarely matters of trial strategy. Moreover, as the Nebraska Supreme Court concluded, McLemore has failed to demonstrate that he was prejudiced by trial counsel's strategy. Even if trial counsel had attacked Martin's credibility by highlighting chronological inconsistencies and utilizing media reports, there was "an overwhelming array of circumstantial evidence of McLemore's guilt." (Filing No. 4-2 at CM/ECF p. 16.) Applying the deferential standards required by both *Strickland* and by § 2254(d), the court finds nothing to indicate that the Nebraska Supreme Court's ruling was "contrary to, or involved an unreasonable application of, clearly established Federal law."

In Claim One, Subparts (A)(4), (B), (C), and (D), McLemore mentions additional instances in which trial counsel allegedly rendered ineffective assistance with respect to Martin. The claims involve allegations that trial counsel failed to impeach Martin's testimony or credibility and failed to object to the State's inaccurate statement in closing argument regarding when McLemore was placed in "'C' mod." (Filing No. 1 at CM/ECF pp. 18-19.) These claims do not appear to have been properly presented in one complete round of review in the Nebraska state courts and therefore are procedurally defaulted. Nonetheless, assuming the claims are not procedurally barred or that the procedural default is excused, the court finds that they are without merit. Specifically, even if the court finds that trial counsel's

---

[11] *See* recitation of the circumstantial evidence set forth in Discussion, Section IV.A.1, *supra* at p. 33.

performance was deficient in these instances, McLemore has failed to demonstrate that he was prejudiced by any such deficiencies. The Nebraska Supreme Court's finding that there was overwhelming circumstantial evidence of McLemore's guilt—beyond Martin's testimony—is entitled to deference. Thus, McLemore is entitled to no relief on any of these claims.

### 4. Hearsay Evidence

In Claim One, Subpart (E), McLemore contends that trial counsel was ineffective for failing to "object to multiple admissions of hearsay evidence" on the ground that these statements violated his Confrontation Clause rights. (Filing No. 1 at CM/ECF p. 19.) This claim will be addressed below in conjunction with McLemore's other Confrontation Clause claims.

### 5. DNA testing

In Claim One, Subpart (F), McLemore claims that trial counsel was ineffective for failing to use defense expert, Dr. Moses Schanfield, to conduct independent DNA testing. (Filing No. 1 at CM/ECF pp. 19-20.)

The Nebraska Supreme Court rejected this claim in its opinion on postconviction appeal. The court wrote:

> In his brief, McLemore argues his trial counsel was ineffective in failing to have additional DNA testing conducted on evidence tested by the State. He also alleges appellate counsel was ineffective in failing to raise this issue on direct appeal.
>
> In his postconviction motion, McLemore alleged Dr. Moses Schanefield was appointed as an expert for him before trial. He also attached two letters authored by Schanefield which, broadly construed, opine about possible inconsistencies in the DNA testing conducted by the State. One inconsistency related to a test done on blood found on the floor inside the entrance to Torres' home. At trial, the State

presented evidence that DNA testing showed this blood came from Torres. McLemore generally claimed that if trial counsel had utilized Schanefield, he could have shown that the blood found inside the house contained none of Torres' DNA. He argues this showing would have impeached Martin's testimony that McLemore told him Torres was inside the house the night of her disappearance. McLemore also asserts generally that trial counsel erred in not utilizing Schanefield to conduct independent DNA testing.

During trial, defense counsel made a record of the letters authored by Schanefield. Counsel also stated on the record that although McLemore wanted him to obtain additional testing of the blood found in the entryway, he did not do so because he did not think retesting would result in any different findings. In the deposition of trial counsel taken during postconviction proceedings, he testified that all the DNA testing was generally favorable to his client, and thus his strategy was not to pursue any additional testing. The postconviction court concluded trial counsel was not ineffective because these trial strategies were reasonable under the circumstances.

We agree. When reviewing a claim of ineffective assistance of counsel, an appellate court will not second-guess reasonable strategic decisions by counsel. On this record, we conclude trial counsel did not perform deficiently, because his decision to not engage in additional testing was a reasonable trial strategy. Because trial counsel was not ineffective, appellate counsel was not ineffective for failing to raise this issue on direct appeal.

(Filing No. 4-2 at CM/ECF pp. 19-21 (footnote admitted).)

The Nebraska Supreme Court's adjudication of McLemore's claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. The Nebraska Supreme Court recognized clearly established federal law as announced in *Strickland* and found that trial counsel's performance was not deficient. The decision of the Nebraska Supreme Court reasonably applied the law and is consistent with it. The decision is also consistent with the presumption that trial counsel's conduct fell within the wide range of

professionally reasonable assistance and sound trial strategy. In his deposition, trial counsel explained the reason why he did not pursue additional DNA:

> I've explained to you, because all that I would be doing was getting—because the government's evidence was that her DNA was not found on him and his not on her, and I didn't want that to change that. I knew how they test DNA, that they test infinite little samples. Now, if I send the same garment out for additional testing and somehow that doctor finds some of the victim's DNA on him or some of him on her because he tested different discrete part of the thing, then where does that leave me ethically, can I pursue the same argument [that there was no physical evidence "to attach" McLemore to the murder of Torres], I don't know. So my attitude is if it's not broke, don't, you know, don't try and fix it.

(Filing No. 4-27 at CM/ECF pp. 19-20.) The Nebraska Supreme Court's conclusion that trial counsel's decision not to pursue further DNA testing was a reasonable trial strategy is well supported by the record. (Filing No. 4-2 at CM/ECF pp. 19-21; *see also* Filing No. 4-13 at CM/ECF pp. 147-48.) The court thus defers to the Nebraska Supreme Court's adjudication of this issue.

### 6. Forensic Expert

In Claim One, Subpart (G), McLemore asserts that trial counsel was ineffective for failing to file a motion for the appointment of an independent pathologist to testify regarding time of death. (Filing No. 1 at CM/ECF p. 20.)

After the evidentiary hearing in the first postconviction action, the state district court determined that the "evidentiary hearing record supports that trial counsel was reasonable in his overall strategy, making it unnecessary to go forward with all of the investigations suggested and unproven by [McLemore]." (Filing No. 4-13 at CM/ECF p. 145.) The court then recited trial counsel's deposition testimony regarding his "strategy and reasoning" for not pursuing an investigation into Torres' time of death:

I had in the research that I had done—the only issue really with regard to the case was the time of death, and the information that I had obtained from my research suggested that that was an issue where, unlike in television where people are able to give you exact hour of time of death, that it's something that's—they simply can't narrow it down to a specific hour or thing of that nature. And the answers that were given to me by Dr. Jones was consistent with the research that I had done, so I didn't see anything there that I could make headway on with regard to time of death. I think also there were police reports with regard to how long that car had been observed in that parking lot.

(Filing No. 4-13 at CM/ECF pp. 145-46; Filing No. 4-29 at CM/ECF pp. 33-34.)

On postconviction appeal, the Nebraska Supreme Court agreed with the state district court that "trial counsel was not ineffective because whether to hire a forensic expert was a question of trial strategy, and on th[e] record it was reasonable for trial counsel not to do so." (Filing No. 4-2 at CM/ECF pp. 21-22 (citing *State v. Branch*, 860 N.W.2d 712 (Neb. 2015)).) The Nebraska Supreme Court thus concluded that "trial counsel did not render deficient performance in failing to hire a forensic expert." (Filing No. 4-2 at CM/ECF p. 22.)

The Nebraska Supreme Court's conclusion that trial counsel chose not to further investigate the time of death as a matter of trial strategy is well supported by the record, and its application of *Strickland* was not contrary to clearly established federal law. As such, McLemore has failed to demonstrate that the Nebraska Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, federal law, and therefore, McLemore is not entitled to habeas corpus relief under 28 U.S.C. § 2254(d).

**7. Remaining Ineffective Assistance of Trial Counsel Claims**

McLemore raised a plethora of additional ineffective assistance of trial counsel allegations in Claim One. These claims were either not raised on direct appeal or, even if they were raised, the Nebraska Supreme Court determined the

record was insufficient to address them, and they were not reasserted in one complete round of review in the Nebraska state courts in the first postconviction proceeding. *See Sims v. Houston*, 562 F. Supp. 2d 1066, 1072 n.4 (D. Neb. 2008). ("If the record is not sufficient to decide the claim on direct appeal, the defendant *must* litigate the claim that his trial counsel was ineffective in a separate state post-conviction action so that a proper record can be made." (emphasis added)); *State v. Bennett*, 591 N.W.2d 779, 782-83 (Neb. 1999) ("Although an appellate court will not address an ineffective assistance of counsel claim on direct appeal when the matter necessitates an evidentiary hearing, an appellate court's refusal to do so does not bar a later motion for postconviction relief.") (internal citation omitted)). Therefore, these claims are procedurally barred.

Even assuming McLemore was able to establish adequate cause for any procedural default of the remaining ineffective assistance of trial counsel claims set forth in Claim One, McLemore has failed to show that any of the claims have merit. The court has independently analyzed the arguments raised in each of the subparts of Claim One. The court has concluded that all the arguments are conclusory, based only on general assertions of prejudice or no assertions of prejudice at all, or are meritless. To discuss the court's reasoning for each of these arguments would unduly prolong the length of this opinion, and it is unnecessary in light of the especially deferential standard of review under *Strickland*.

To the extent any of the remaining subparts of Claim One are subsumed within the claims discussed by the Nebraska Supreme Court in its opinion on McLemore's first postconviction appeal (filing no. 4-2 at CM/ECF pp. 5-22), they are denied. McLemore did not rebut, by clear and convincing evidence, the Nebraska Supreme Court's findings or establish that the Nebraska Supreme Court's rejection of these claims was based on an unreasonable determination of the facts in light of the evidence or that it was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

**B. Prosecutorial Misconduct Claims**

In Claim Two, McLemore alleges several instances of prosecutorial misconduct during trial. ([Filing No. 1 at CM/ECF pp. 21-23](#).) In the first postconviction appeal, the Nebraska Supreme Court concluded that because this assignment was not properly raised on direct appeal, it was procedurally barred on postconviction review. Specifically, the court stated:

> All of the information needed to support this assignment was available to McLemore when he filed his direct appeal. He did not, however, assert a claim of prosecutorial misconduct on direct appeal. A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal no matter how those issues may be phrased or rephrased.

([Filing No. 4-2 at CM/ECF p. 3](#) (citing *Thorpe*, 858 N.W.2d 880; *State v. Boppre*, 790 N.W.2d 417 (2010)).) In light of the Nebraska Supreme Court's "plain statement" that it was rejecting McLemore's prosecutorial misconduct claims on independent and adequate state procedural grounds, Claim Two is procedurally defaulted. *See Shaddy*, 890 F.2d at 1018.

In Claim Four, Subpart (A)(2), McLemore raises the issue of prosecutorial misconduct in the context of ineffective assistance of appellate counsel on direct appeal. ([Filing No. 1 at CM/ECF p. 25](#).) McLemore raised this same claim in his first postconviction appeal, but the Nebraska Supreme Court declined to address it because McLemore's "motion for postconviction relief did not allege that appellate counsel was ineffective for failing to raise issues of prosecutorial misconduct on direct appeal." ([Filing No. 4-2 at CM/ECF p. 3](#) (citing *State v. Duncan*, 775 N.W.2d 922 (Neb. 2009)).) *See also Osborne v. Purkett*, 411 F.3d 911, 919 (8th Cir. 2005) (a claim of ineffective assistance of direct appeal counsel must be raised in a postconviction motion and on postconviction appeal). Again, because of the Nebraska Supreme Court's "plain statement" that it was rejecting McLemore's ineffective assistance of appellate counsel on independent and adequate state

procedural grounds, Claim Four, Subpart (A)(2) is also procedurally defaulted. *See Shaddy*, 890 F.2d at 1018.

The court acknowledges that in his second postconviction action McLemore tried to raise the claim that appellate counsel was ineffective for failing to raise issues of prosecutorial misconduct on direct appeal (filing no. 4-14 at CM/ECF p. 203), but that attempt was denied because the claim was time barred. (Filing No. 4-10.) As a result, none of McLemore's claims alleging prosecutorial misconduct have ever been presented on the merits to the Nebraska Supreme Court, and they cannot be presented now.

## C. Confrontation Clause Claims

McLemore asserts, in several different contexts, that his Confrontation Clause rights were violated when family and friends of Torres testified about statements Torres made about her fear of McLemore. The claims are as follows:

- Claim Three: McLemore alleges that his rights under the Confrontation Clause were violated when the State elicited testimony from "family and friends" of Torres about Torres' alleged actions or statements. (Filing No. 1 at CM/ECF pp. 23-24.) McLemore identifies testimony from Holcomb, Ludwig, McNeal, Lucero, and Mentzer. (Filing No. 1 at CM/ECF pp. 23-24.)

- Claim Four, Subpart (A)(3): McLemore asserts that appellate counsel was ineffective for failing to argue on direct appeal that this testimony violated the Confrontation Clause, as set forth in Claim Three.[12] (Filing No. 1 at CM/ECF p. 25.)

---

[12] Under this claim, McLemore also states: "Trial counsel never preserved [a Confrontation Clause] violation as he never objected to the testimony on grounds of a violation of [McLemore's] rights under the Confrontation Clause." (Filing No. 1 at CM/ECF p. 25.)

- Claim One, Subpart (E): McLemore contends that trial counsel was ineffective for failing to "object to multiple admissions of hearsay evidence" on the ground that these statements violated his Confrontation Clause rights. ([Filing No. 1 at CM/ECF p. 19.](#)) McLemore identifies testimony from Holcomb, Ludwig, Lucero, and Mentzer. ([Filing No. 1 at CM/ECF p. 19.](#))

In his postconviction appeal brief, McLemore argued, as he does in Claim Three of the Petition, "that his rights under the Confrontation Clause were violated when testimony was elicited by the State 'from family and friends of' Torres about Torres' alleged actions or statements." ([Filing No. 4-2 at CM/ECF p. 22.](#)) The Nebraska Supreme Court concluded that this argument was procedurally barred because it "could have been raised on direct appeal but was not." ([Filing No. 4-2 at CM/ECF p. 22.](#)) In light of the Nebraska Supreme Court's "plain statement" that it was declining to consider this claim on independent and adequate state procedural grounds, Claim Three is procedurally defaulted. *See Shaddy*, 890 F.2d at 1018.

In Claim Four, Subpart (A)(3), McLemore asserts that appellate counsel was ineffective for failing to argue on direct appeal that the testimony identified in Claim Three violated the Confrontation Clause. ([Filing No. 1 at CM/ECF p. 25.](#)) It does not appear that McLemore asserted this same claim on postconviction appeal. Rather, the Nebraska Supreme Court interpreted McLemore's argument on postconviction appeal "to be that appellate counsel should have asserted that trial counsel was ineffective in failing to make proper [Confrontation Clause] objections and preserve the matter for review."[13] ([Filing No. 4-2 at CM/ECF p. 23.](#)) The court

---

[13] Specifically, the Nebraska Supreme Court construed McLemore's postconviction motion as alleging that "trial counsel was ineffective in failing to protect his rights under the Confrontation Clause, and that appellate counsel was ineffective in failing to properly raise and preserve the ineffective assistance of trial counsel in this regard on direct appeal." ([Filing No. 4-2 at CM/ECF p. 22.](#)) The Nebraska Supreme Court then noted that appellate counsel did in fact "assign and argue that various statements made by witnesses about Torres' actions and statements were inadmissible hearsay" and that the Nebraska Supreme Court "concluded in the direct appeal that because much of the alleged testimony was

liberally construes Claim One, Subpart (E) and Claim Four, Subpart (A)(3) of the Petition together as asserting the same claim raised on postconviction appeal.

Like the Petition, McLemore's postconviction appeal brief identified testimony from family and friends of Torres about Torres' alleged actions or statements. However, the state district court and the Nebraska Supreme Court limited its Confrontation Clause analysis to "just two specific instances of testimony" referenced in the postconviction motion. The Nebraska Supreme Court wrote:

> First, a witness testified she was present when McLemore overheard Torres talking about reuniting with her husband, and the witness heard McLemore state "If he couldn't have her, nobody was going to have her." Similarly, another witness testified that when McLemore overheard Torres talking about reuniting with her husband, McLemore stated "If I couldn't have her, nobody would have her."

([Filing No. 4-2 at CM/ECF p. 23.](#)) The Nebraska Supreme Court then proceeded to address the merits of McLemore's argument with respect to these two instances of testimony:

> The Confrontation Clause of the Sixth Amendment to the U.S. Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him or her. The Fourteenth Amendment makes the guarantees of this clause obligatory upon the states. We agree with the postconviction court that neither of these instances involved a violation of McLemore's confrontation rights. Both witnesses testified at trial about statements McLemore made, not about statements Torres made. McLemore had a

_____

admitted without objection and any testimony objected to was cumulative, there was no prejudicial error." ([Filing No. 4-2 at CM/ECF pp. 22-23](#) (footnote omitted).) In light of the resolution of the hearsay issue on direct appeal, the Nebraska Supreme Court thus interpreted McLemore's argument on postconviction appeal "to be that appellate counsel should have asserted that trial counsel was ineffective in failing to make proper [Confrontation Clause] objections and preserve the matter for review." ([Filing No. 4-2 at CM/ECF p. 23.](#))

full opportunity to confront and cross examine the witnesses about the statements. There is no Confrontation Clause issue presented by the allegations of McLemore's postconviction motion.

(Filing No. 4-2 at CM/ECF pp. 23-24 (footnote omitted).)

The Nebraska Supreme Court declined to consider "additional instances of alleged improper testimony by trial witnesses as to prior statements made by Torres" because "these allegations were not included in the motion for postconviction relief and considered by the district court," and thus, they were not properly before the court. (Filing No. 4-2 at CM/ECF p. 24 (citing *Thorpe*, 858 N.W.2d 880).)

In his Petition, McLemore hinges his various Confrontation Clause claims on the "additional instances of alleged improper testimony" identified by the Nebraska Supreme Court in its opinion on postconviction appeal. In light of the Nebraska Supreme Court's "plain statement" that it was declining to consider these allegations on independent and adequate state procedural grounds (namely, because these allegations were not included in the motion for postconviction relief and considered by the district court), McLemore's Confrontation Clause claims regarding the "additional instances of alleged improper testimony" are procedurally defaulted. *See Shaddy*, 890 F.2d at 1018.

McLemore does not appear to argue here that the two instances of testimony identified by McLemore in his postconviction motion violated the Confrontation Clause. Nonetheless, even assuming that McLemore raised this claim in his Petition, he is not entitled to relief. McLemore did not rebut the Nebraska state courts' findings that the two instances of testimony identified by McLemore in his postconviction motion were statements that McLemore (not Torres) made. Furthermore, the Nebraska state courts' ruling that these two instances of testimony did not violate the Confrontation Clause because they were statements made by McLemore is not an unreasonable application of, or contrary to, federal law.

**D. Ineffective Assistance of Appellate Counsel and Postconviction Counsel Claims**

Claim Four consists of several allegations of ineffective assistance of appellate counsel and ineffective assistance of postconviction counsel. (Filing No. 1 at CM/ECF pp. 24-26.) Specifically, McLemore claims that appellate counsel rendered ineffective assistance by failing to raise the following issues on direct appeal: (1) Wisecarver's "false testimony," as set forth in Claim One, Subpart (A)(1); (2) prosecutorial misconduct, as set forth in Claim Two; and (3) Confrontation Clause violations, as set forth in Claim Three. (Filing No. 1 at CM/ECF p. 25.) The court has addressed the latter two claims above.

With respect to the claim that appellate counsel was ineffective for failing to raise the issue regarding Wisecarver's "false testimony" on direct appeal, McLemore did not raise this same claim in his first postconviction action in the Nebraska state courts and, thus, it is arguably procedurally defaulted. *See Wemark*, 322 F.3d at 1021. Nonetheless, the claim is without merit. Appellate counsel's decision not to raise an unpreserved error on direct appeal is entitled to the "benefit of the doubt." *Woods*, 136 S. Ct. at 1153. Moreover, McLemore has not demonstrated that had appellate counsel raised the issue on direct appeal, there is a reasonable probability that the outcome of his appeal would have been different. Indeed, on direct appeal, the Nebraska Supreme Court found that the evidence was sufficient for the jury to convict McLemore, without reference to, or reliance on, Wisecarver's testimony. (Filing No. 4-1 at CM/ECF pp. 10-12.)

Claim Four, Subpart (A)(4) appears to be a freestanding claim of ineffective assistance of postconviction counsel for failing to "describe[] with specificity" claims of ineffective assistance of appellate counsel. (Filing No. 1 at CM/ECF p. 25.) This claim fails because 28 U.S.C. § 2254(i) bars freestanding claims of ineffective assistance of postconviction counsel, and there is no constitutional right to effective assistance of postconviction counsel, *Barnett v. Roper*, 904 F.3d 623, 629 (8th Cir. 2018). Therefore, Claim Four, Subpart (A)(4) fails on the merits.

Furthermore, as set forth below in Section F, ineffective assistance of postconviction counsel does not excuse any of the procedurally defaulted claims.

## E. "*Massiah* Violation" Claim

In Claim Five, McLemore argues that he was denied his Sixth Amendment right to counsel, namely a "*Massiah* violation" by use of an informant in violation of Neb. Rev. Stat. § 29-2262.01 (reissued 1995). (Filing No. 18.) This claim was raised in the addendum to the first postconviction motion (filing no. 4-13 at CM/ECF pp. 92-98) but was not discussed in the state district court's order denying postconviction relief. In any event, McLemore did not specifically assign the *Massiah* claim as error in his postconviction appeal brief. (Filing No. 4-7 at CM/ECF p. 7.) Therefore, this claim is procedurally defaulted. *See Jolly v. Gammon*, 28 F.3d 51, 53 (8th Cir. 1994) ("Failure to raise a claim on appeal from the denial of a post-conviction motion erects a procedural bar to federal habeas review.").

Moreover, the *Massiah* claim could have been raised on direct appeal but was not. It is likely the state district court deemed the claim barred and therefore did not address it in its order denying postconviction relief. Furthermore, had the claim been raised on postconviction appeal, the Nebraska Supreme Court would have declined to review it because it could have been litigated on direct appeal. *See Thorpe*, 858 N.W.2d 880; *Boppre*, 790 N.W.2d 417. Indeed, McLemore states in his responsive brief that the "*Massiah* violation" claim "was hit" with a procedural default by the Nebraska state courts because it was not raised on direct appeal. (Filing No. 35 at CM/ECF p. 24.) The court understands that McLemore is asserting that the procedural default of the *Massiah* claim is excused by appellate counsel's failure to raise the claim on direct appeal. Assuming for the sake of argument that appellate counsel was ineffective, McLemore's *Massiah* claim remains barred nonetheless because ineffectiveness of appellate counsel may not be asserted as cause to excuse procedural default unless the petitioner has first presented this argument "as an independent Sixth Amendment claim to the state courts, if a forum existed to make the argument." *McKinnon v. Lockhart*, 921 F.2d 830, 832 (8th Cir.1990), *cert.*

*denied*, 501 U.S. 1208 (1991); *accord Whitmill v. Armontrout*, 42 F.3d 1154, 1157 (8th Cir. 1994). Because McLemore never presented an independent claim of ineffective assistance of appellate counsel with respect to the *Massiah* claim in one complete round of review in the Nebraska state courts,[14] that claim cannot serve as cause to excuse his procedural default. *See Scroggins v. Lockhart*, 934 F.2d 972, 975 (8th Cir. 1991) (a claim of ineffectiveness of appellate counsel must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default). And, to the extent McLemore argues that postconviction counsel Kahler was ineffective in failing to assert in the first postconviction action that appellate counsel was ineffective for failing to raise the *Massiah* claim on direct appeal, this argument fails because there is no constitutional right to effective assistance of postconviction counsel. *See Barnett*, 904 F.3d at 629. Nor can the alleged ineffective assistance of postconviction counsel excuse any procedural default, as discussed immediately below.

**F. Cause and Prejudice**

*Martinez*'s narrow exception to the procedural default doctrine does not save any of McLemore's defaulted claims. In *Martinez*, the Supreme Court held that "[i]nadequate assistance of counsel [or the absence of counsel] at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9. However, the *Martinez* exception applies only to defaulted claims of ineffective assistance of trial counsel, not to any other kind of trial error or to ineffective assistance of direct-appeal counsel. *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (emphasizing that *Martinez* "provides no support for extending its narrow exception to new categories of

---

[14] Any attempt by McLemore to raise this claim in his second postconviction action was denied because the claim was time barred. (Filing No. 4-10.) Furthermore, McLemore cannot raise this claim in another successive postconviction motion. *See Ortiz*, 670 N.W.2d at 792. In addition, any other successive postconviction motion filed by McLemore would also be barred by Nebraska's statute of limitations.

procedurally defaulted claims"); *Dansby v. Hobbs*, 766 F.3d 809, 832-34 (8th Cir. 2014). Finally, the Supreme Court's *Martinez* decision regarding ineffective assistance of postconviction counsel and the fact that under limited circumstances the ineffectiveness of postconviction counsel may provide cause for a default does not apply here because Nebraska's collateral review process was not the first opportunity McLemore had to raise the ineffective assistance of trial counsel claim as McLemore had separate counsel on the direct appeal. *See Dansby*, 766 F.3d at 834; *Pigee v. Frakes*, No. 4:17CV3157, 2018 WL 2120326, at *6 & n.3 (D. Neb. May 8, 2018).

## G. Actual Innocence or Miscarriage of Justice

Finally, McLemore has failed to excuse his defaulted claims by showing that he is actually innocent or that there was a miscarriage of justice.

To obtain review of an otherwise procedurally barred claim based on actual innocence, a petitioner must satisfy a two-part test: (1) the "allegations of constitutional error must be supported with new reliable evidence not available at trial"; and (2) "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Nash v. Russell*, 807 F.3d 892, 899 (8th Cir. 2015) (citing *Schlup*, 513 U.S. at 327-28); *accord Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001). Actual innocence means factual innocence, not legal innocence or legal insufficiency. *Narcisse v. Dahm*, 9 F.3d 38, 40 (8th Cir. 1993). The Eighth Circuit has determined that the actual innocence "standard is strict; [and] a party generally cannot demonstrate actual innocence where there is sufficient evidence to support a conviction." *Wadlington v. United States*, 428 F.3d 779, 783 (8th Cir. 2005). The court has carefully examined the record; the evidence was sufficient to convict McLemore beyond a reasonable doubt. To the extent McLemore seeks to prove his actual innocence through Jessup Smith's affidavit and Martin's post-trial interview, the court refers to its earlier order concluding that the recantation evidence is unreliable and does not establish his innocence. (*See* Filing No. 16 at CM/ECF pp. 6-9.) Thus, the court finds McLemore has not satisfied the

requisite elements to excuse his procedurally defaulted claims through any "gateway" claim of actual innocence.

## V. CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that McLemore is not entitled to a certificate of appealability.

IT IS THERFORE ORDERED that the Petition for Writ of Habeas Corpus (filing no. 1 & filing no. 18) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

Dated this 11th day of March, 2020.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge